**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| YOLANDA S. HOLDEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-06-2981 |
| | § | |
| ILLINOIS TOOL WORKS, INC. and | § | |
| VALERON STRENGTH FILMS CO., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Yolanda Holden sued her employers, Illinois Tool Works, Inc. ("ITW") and Valeron Strength Films Co. ("Valeron"), alleging sex discrimination, sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ITW moved for summary judgment on the grounds that Holden's claims are barred by the statute of limitations and her failure to exhaust administrative remedies. ITW also asserts that Holden cannot as a matter of law prevail on her sexual harassment or retaliation claims. (Docket Entry No. 10). Holden has responded, (Docket Entry No. 18); and ITW has replied, (Docket Entry No. 22). Based on a careful review of the motion, the responses and replies, the record, and the applicable law, this court denies ITW's summary judgment motion. Trial is scheduled during the two-week period from February 11, 2008 to February 22, 2008.

ITW has also filed two motions for sanctions.  (Docket Entry Nos. 14, 21).  Holden has replied to ITW's first motion for sanctions.  (Docket Entry No. 24).  The sanctions issue is not resolved in this opinion.  The court will hold an evidentiary hearing on the sanctions motions in connection with the trial.

The parties have filed an agreed motion to dismiss Valeron as a defendant in this case. (Docket Entry No. 25).  The agreed motion to dismiss Valeron is granted.

The reasons for these rulings are set out below.

## I.    Background

ITW manufactures high-strength polyethylene films.  Holden began working for ITW in August 2002 as a Laminator Operator's Assistant.  ITW promoted Holden to Laminator Operator Level 1 on January 20, 2003 and to Laminator Operator Level 2 in October 2003. In October 2004, Holden was promoted to Laminator Operator Level 3.  In September 2006, Holden bid for and was awarded the position of Rewinder Operator, which she holds now.

Holden is the only female in her department.  In this suit, Holden alleges that two of her coworkers, George Cotton and Reginald Frazier, sexually harassed her by making explicitly sexual offensive comments and gestures and by unwanted sexual touching.  She alleges that George Cotton showed her a picture in a magazine of a woman wearing a G-string and asked Holden how she liked it; that he called Holden "at least twice" on her work station phone and made "unwelcome sexual remarks to [her]," telling her that "he would do oral sex with [her] and wanted to have oral sex with [her]"; and that he came to her work area

and "wouldn't leave [her] alone," making sexual comments to her.  (Docket Entry No. 18, Ex. B at 88, 90).  Holden testified at her deposition that when she complained about his behavior, Cotton also threatened her, telling her that if she "did not stop reporting him, that he was going to help [her] team get [her] fired."  (*Id.*, Ex. B at 91).  Holden alleges that her complaints to her managers and the human resources department did not result in any corrective action.

Holden alleges that Reginald Frazier came by her work station and brushed up against her breasts and that he told Holden "how he was sure that [she] could really sexually satisfy [her] man."  (*Id.*, Ex. A at 2)."  Holden asserts that she complained about Frazier's sexual harassment to her supervisors, the plant manager, and the human resources department, but that  ITW took no corrective action.

Holden also alleges that her supervisor and coworkers repeatedly told her that the workplace at ITW was "not a woman's place."  (Docket Entry No. 18 at 3–4).  She alleges that her team leader, Jimmy Shelley, repeatedly told her that "this job wasn't a place for a woman, that [she] needed to take another job, less strenuous.  It was too much heavy lifting . . . and it—it wasn't a woman's place."  (Docket Entry No. 10, Ex. A, Attachment 1 at 111–12).  Holden also alleges that Nate Dawson told her to "bid out or bid down on the job," (*id.*, Ex. A, Attachment 1 at 112), and that Pauline Serice, a consultant for ITW, told Holden, "Well, it's obvious to me that you can't do your job.  Why don't you just be woman enough

to say that you can't do your job and just quit?  Make it easy for all of us.  Instead of me firing you, you just quit.  Go on and quit."  (*Id.*, Ex. A, Attachment 1 at 143).

Holden alleges that she suffered discrimination, including verbal abuse from her coworkers.  Wilbert Barnes threatened her on the job, sticking his finger in her face and calling her a "motherfucker."  (Docket Entry No. 18, Ex. A at 2).  On that occasion, Barnes was "in such a rage and screaming and his body language was so threatening" that Holden's team leader, Jimmy Shelley, "jumped in between [them]."  (Docket Entry No. 18, Ex. B at 99–100).  Holden was so upset by the incident that she "went to the bathroom and started crying."  (*Id.*, Ex. B at 100).  When she returned and told Shelley that "he really needed to handle the situation further" and that she was going to speak to human resources about the situation, Shelley "started laughing and said, Well, that's our word against yours."  (*Id.*, Ex. B at 101).  Shelley refused to report the incident to human resources and told Holden that she could not make him report it.  (*Id.*, Ex. B at 101).  She alleges that Nate Dawson was verbally abusive on occasions when the equipment at her work station had problems, (*id.*, Ex. A, Attachment 1 at 109).  Holden alleges that the abuse went beyond the verbal.  She alleges that on three separate occasions, Nate Dawson turned on Holden's laminator machine without her permission while she was adjusting the film and her hands were still on the laminator roller.  Holden complained about this behavior to Jimmy Shelley as well as to ITW's human resources department, to no avail.  (*Id.*, Ex. A, Attachment 1 at 109).

Holden alleges that she was discriminated against by not receiving overtime and promotion opportunities on the same basis as her male coworkers.  Holden testified that Barnes told her to "bid down for another job" because "this job was not for a female because it required heavy lifting." (*Id.*, Ex. A at 2).  Although overtime "was supposed to go into a rotation" of employees, Barnes never offered overtime to Holden when he was in charge of scheduling overtime. (*Id.*, Ex. B at 101–02).  Greg May refused to train Holden for the laminator position and told her that since she did not have kids, she "needed to let a man do that job with a family . . . because it—it was a too strenuous job for a woman." (Docket Entry No. 10, Ex. A, Attachment 1 at 115).  When Holden was first hired in 2002, May told Holden that she "wasn't the person that they wanted to choose for the job." (*Id.*, Ex. A, Attachment 1 at 114).  May later told Holden to "bid out or bid down on the job." (*Id.*, Ex. A, Attachment 1 at 112).

Holden alleges that because of the harassment and discrimination, she has suffered emotional distress, for which she now takes medication.  She testified that she had sleepless nights and nightmares and that she suffered nausea and vomiting from the stress of not being "allowed to do [her] job fully" and for fear of "being retaliated against." (Docket Entry No. 18, Ex. B at 208).  Her hair began falling out due to the stress. (*Id.*, Ex. B at 208).  She began seeing an unlicensed therapist through ITW's employment assistance program to deal with the stress she experienced on the job and now sees a psychiatrist.

Holden testified that when she complained about her coworkers' conduct to ITW's human resources department, she was told to "be more sociable with the guys" and "get to know them on a personal basis." (Docket Entry No. 18, Ex. B at 152). She was "going for a Level 4" position when she met with Scott Hawkins and Virginia McDonough from ITW's human resources department on June 24, 2005 to complain about being harassed by her coworkers. (*Id.*, Ex. B at 153). After the meeting, she was told that she could not progress with training for Level 4, but instead "had to go all the way back to the bottom and start up" with retraining. (*Id.*, Ex. B at 202). Holden learned that McDonough, Hawkins, Serice, and several other ITW employees had agreed that she had to retrain on the laminator machine because her team members on the "C" shift "did not like the way [she] worked or the way [she] operated the machine as a laminator operator." (*Id.*, Ex. B at 153). If she did not retrain back to her current level within a certain length of time, her paid would be cut. (*Id.*, Ex. B at 202). Holden testified that her team members criticized the way she operated the machine and refused to train her. She only received training to become a Laminator Operator Level 3 by working on the "D" shift, which volunteered to train her for that level. (*Id.*, Ex. B at 153).

Holden alleges that because of her sex, she was denied a promotion to Laminator Operator Level 4 and that ITW refused to provide her the necessary training for a promotion to Laminator Operator Level 4. Holden alleges that Greg May refused to train her, "or if he did train [her], he trained [her wrong]. He would deliberately—the whole team would

deliberately tell me the wrong things . . . with the training." (Docket Entry No. 10, Ex. A, Attachment 1 at 115).  Because the team refused to train her, Holden "had to go to another team to get trained." (Docket Entry No. 18, Ex. B at 200).

Holden also alleges that she was denied the opportunities for overtime work that similarly situated male coworkers received.  In her deposition, she testified that Wilbert Barnes and Jimmy Shelley denied her overtime and that Shelley told her that she "didn't need the money because she "was married and the job wasn't no place for no woman.  He don't understand why [Holden's husband] just didn't make [her] quit." (Docket Entry No. 10, Ex. A, Attachment 1 at 245).  Holden alleges that she received less pay than similarly situated male coworkers as a result of being denied commensurate overtime

Holden asserts that after she filed a complaint with the EEOC, she was denied Level 4 training, denied opportunities for overtime pay, and was "given unwarranted disciplinary actions and poor evaluations." (Docket Entry No. 18 at 4).  She testified that her coworkers retaliated against her for complaining of sexual discrimination and harassment by "changing the—the settings on [her] machine" and that whenever she left her machine, her coworkers were "going up there messing with [her]—messing with [her] computer." (Docket Entry No. 18, Ex. B at 234–35).  Eric Richardson reported that she did not follow work instructions. He "claimed that [Holden] set up something wrong on the machine" and was responsible for a problem that Holden had discovered. (Docket Entry No. 18, Ex. A, Attachment 1 at 238). Holden stated in her deposition that the work instructions were wrong and "not being written

7

properly," (*id.*, Ex. A, Attachment 1 at 237), and that contrary to Richardson's assertions, she

"wasn't even in the plant when it was set up wrong." (*id.*, Ex. A, Attachment 1 at 238).

Holden also alleged in her deposition that she was the only person written up for operating

a machine while there was a spillage on the plant floor.

On July 8, 2005, Holden filed an EEOC charge against ITW. In her EEOC complaint,

she alleged that ITW denied her opportunities to work overtime and that her coworkers and

supervisors told her that these denials were based on her sex. She "was even asked during

[an] interview about how [she] would respond if male employees did not want [her] working

at the Company" because she is a woman. (Docket Entry No. 10, Ex. A, Attachment 2 at 1).

She also complained that ITW "has knowingly tolerated other employees sexually harassing

[her]" and that she reported all instances of sexual harassment to her supervisor and the

human resources department, but ITW did nothing. She stated that a supervisor told her that

if she "didn't just get along with the guys and report back that they were a joy to work with,"

she would be fired. (*Id.*, Ex. A, Attachment 2 at 2). After complaining about the harassment

and sex discrimination, Holden stated that her job performance was criticized and was told

that she "should just quit 'because [she] can't do the job.'" (*Id.*, Ex. A, Attachment 2 at 2).

Holden filed suit on September 21, 2006. After discovery, ITW filed this motion.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The

movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics*

9

*Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. ExxonMobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

## III. Analysis

### A. Does the Statute of Limitations Bar Holden's Claims?

ITW argues that "the majority of [Holden's] claims are barred by the statute of limitations" under Title VII's provision that a plaintiff alleging discrimination must file a complaint with the EEOC within three hundred days after the alleged unlawful employment practice occurred.  (Docket Entry No. 10 at 10).  Because Holden filed her EEOC charge on July 8, 2005, ITW contends that Holden may not base her claims on any acts or events that occurred before September 11, 2004.  (Docket Entry No. 22 at 11). ITW contends that George Cotton's employment was terminated on December 1, 2003 for "no call no show"

10

absenteeism, (Docket Entry No. 22, Ex. A, Attachment 2), and that a human resources record shows that Holden complained about Dawson turning on her laminating machine on or before January 30, 2003.  ITW also points out that May told Holden that she "wasn't the person that they wanted for this job" in 2002, when she was first hired.  ITW asserts that Holden's sexual harassment claim based on Cotton's actions and Holden's sex discrimination claims based on Dawson's and May's actions are time-barred.  ITW also argues that "to the extent that [Holden's alleged incident with Mr. Barnes (where he allegedly 'stuck his finger in [her] face and called [her] a mother f** and threatened [her]') occurred prior to May 4, 2004, it too is barred by the statute of limitations."  (Docket Entry No. 10 at 11 n.12).

In response, Holden disputes that Cotton's employment was terminated in December 2003.  She points to Shelley's deposition, in which he testified that Cotton was terminated in "'04 or the early part of '05" for failing a random drug test.  (Docket Entry No. 18, Ex. C at 136).  Holden contends that a fact issue exists as to when Cotton was terminated and whether her claims based on his actions are time-barred.

To show a hostile work environment sexual harassment claim, a plaintiff must show that she: (1) belongs to a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.  *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005); *see also Woods v. Delta Beverage Group, Inc.*,

274 F.3d 295, 298 (5th Cir. 2001) (distinguishing between Title VII sexual harassment claims involving supervisors and coworkers and noting that when the harasser is a coworker, the plaintiff must prove all five elements of a hostile work environment claim); *E.E.O.C. v. WC&M Enters, Inc.*, 496 F.3d 393, 399 (5th Cir. 2007).   The conduct must be both subjectively and objectively offensive, *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998), and sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working environment, *Harvill*, 433 F.3d at 434.

To the extent that Holden seeks to assert a claim for sexual harassment based solely on Cotton's conduct, such a claim is time-barred.  ITW has shown that Cotton's employment was terminated on December 1, 2003 and that any sexually harassing conduct by Cotton occurred outside the 300-day limitations period.  An ITW "Employment Notice and Status Change Form" states that Cotton's employment was terminated on December 1, 2003. Cotton's EEOC charge, which he filed on February 23, 2004, also states that his employment was terminated on December 1, 2003.  Holden relies on Shelley's deposition testimony to support her assertion that Cotton may have left ITW in 2004 or 2005.  In his deposition, Shelley testified that he did not know with certainty when Cotton's employment was terminated.  Shelley testified that the date of Cotton's departure from ITW "might have been in '04 or the early part of '05, I believe."  (Docket Entry No. 18, Ex. C at 136).  Holden has failed to show that a disputed fact issue exists as to when Cotton's employment was terminated.  Cotton's conduct, standing alone, could not be a basis for recovery.

12

Holden has, however, alleged and presented summary judgment evidence of harassment that occurred within the 300-day period.  The continuing violations doctrine allows a plaintiff to recover for a pattern or policy of discrimination even if some of the alleged discriminatory conduct fell outside the actionable period, as long as one or more of the related acts occurred within the limitations period.  The Supreme Court recently clarified the limits of the continuing violations doctrine.  In *Nat.'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002), the Court held that discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  *Id.* at 113.  Each discriminatory act starts a new clock for filing charges alleging that act.  *Id.*  In contrast to discrete acts, the Court carved out an exception for claims based on a hostile work environment.  Noting that repeated conduct constitutes a part of the nature of hostile environment claims, the Court held that hostile environment claims "will not be time barred so long as all acts which constitute the claim are part of the same unlawful practice and at least one act falls within the time period." *Id.*  The Supreme Court recognized that "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Id.* at 115 (citing 1 B. LINDEMANN & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 348–49 (3d ed.1996) ("The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence")).  A hostile environment "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."

13

*Id.* (citing *Harris*, 510 U.S. at 21)).  Because the incidents constituting a hostile work environment are part of one unlawful employment practice, the Supreme Court has held that "[i]n order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* at 118; *see also Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279–80 (5th Cir. 2004) ("[C]laims based on hostile environment are only timely where at least one act occurred during the limitations period."). As long as an act contributing to the hostile environment occurs within the filing period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. *Morgan*, 536 U.S. at 117.

Holden's hostile work environment sexual harassment claim is not barred by limitations. Holden alleges in her complaint that the defendants have subjected her to a "sexually hostile work environment" by "making her working conditions intolerable for an ordinary reasonable person."  (Docket Entry No. 1 at 7).  She has presented summary judgment evidence of sexual harassment occurring the course of her employment that support a hostile work environment claim.  These include sexually explicit offensive comments by Cotton and Frazier; unwanted touching by Frazier; frequent statements by coworkers that the laminator position was not a woman's place, that her job was too strenuous for a woman, and that she should bid for lower level job so that a man with a family to support could take her position; and "tricks" with her laminator machine.  To the extent that conduct by Cotton, Dawson, May, and Barnes contributed to Holden's work environment, evidence as to those

acts is not barred.  Under *Morgan*, such a hostile work environment claim based on repeated conduct is not time barred because Holden has presented evidence that some of the offensive conduct occurred during the limitations period.

To the extent that Holden alleges discrete acts of discrimination occurring outside the limitations period, such as the refusal to train or promote, or the denial of overtime, these acts are separately actionable and may not be pursued outside the limitations period.  Holden has also alleged discrete acts of discrimination occurring within the 300-day limitations period, which are not barred.  Evidence of discrete acts occurring before the limitations period may be considered even if they are not separately actionable.  *See Morgan*, 536 U.S. at 113 ("Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.").

ITW's motion for summary judgment on the ground that Holden's claims are time-barred is denied.

### B.    Did Holden Fail to Exhaust her Claims?

ITW argues that Holden's EEOC charge fails to include allegations about Barnes and May and that claims based on their statements and acts are therefore barred.  (Docket Entry No. 10 at 21; Docket Entry No. 22 at 13).  ITW argues that because Holden failed to include in her EEOC charge allegations about Barnes's threats to her and May's statement that she "wasn't the person that they wanted to choose for the job," she has failed to exhaust her administrative remedies and cannot proceed with claims based on these allegations.  (Docket

Entry No. 10 at 13).  ITW relies on *Vitello v. Liturgy Training Pubs.*, 932 F. Supp. 1093 (N.D. Ill. 1996), for the proposition that "[f]or allegations in a complaint to be like or reasonably related to the charge allegations, a factual relationship needs to exist between them."  (Docket Entry No. 10 at 13).

In response, Holden argues that she is not required to quote each discriminatory statement made by her coworkers in her EEOC charge.  Citing *Danner v. Phillips Petroleum Co.*, 447 F.2d 159 (5th Cir. 1971), Holden argues that the purpose of an EEOC charge is to provide an employer with notice of the alleged discriminatory conduct.  Holden contends that her allegations in this lawsuit of sexual harassment and discrimination based in part on conduct of Barnes and May are consistent with the allegations of harassment and discrimination that she asserted in her EEOC charge.

Filing a discrimination charge with the EEOC is a condition precedent to filing a Title VII suit.  *Young v. City of Houston*, 906 F.2d 177 (5th Cir. 1990).  This requirement serves two purposes: affording the EEOC and the employer an opportunity to settle the dispute through conciliation, and giving the employer notice.  A lawsuit stemming from EEOC charges "may be based, not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination."  *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1992) (quoting *Fellows v. Universal Restaurants, Inc.*, 701 F.2d 447,

451 (5th Cir. 1983)); *see Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)

(establishing this standard); *see also Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd.*

*of San Antonio, Tex.*, 40 F.3d 698, 711 (5th Cir. 1994) (citing *Sanchez* with approval);

*Haynes v. BlueCross and BlueShield of Texas, Inc.*, No. Civ.A.3:97-CV-2881-R, 2000 WL

140744, *6 (N.D. Tex. Feb. 4, 2000) ("*Sanchez* is clearly the law of the [Fifth] [C]ircuit on

this issue.").  "[T]his rule protects unlettered lay persons making complaints without legal

training or the assistance of counsel." *Fine*, 995 F.2d at 578.  Courts must interpret the scope

of an EEOC complaint broadly and not permit procedural technicalities to obstruct

complainants.  *Clark v. Kraft Foods, Inc.*, 18 F.3d 1278, 1280 n.7 (5th Cir. 1994) (citing

*Fellows*, 701 F.2d at 452); *Sanchez*, 431 F.2d at 465; *see also Price v. Sw. Bell Tel. Co.*, 687

F.2d 74, 78 (5th Cir. 1982) ("[W]e construe employment discrimination charges with the

utmost liberality . . . .") (internal quotations omitted).

Holden's EEOC charge complains of discrimination and harassment based on sex and

retaliation.  (Docket Entry No. 10, Ex. A, Attachment 2 at 1).  In the charge, Holden alleged

that she was denied opportunities to work overtime and that other employees and her

supervisors told her that she was denied such opportunities because she is a woman.  She

asserted that when she interviewed for the position, she was asked how she "would respond

if male employees did not want [her] working at the Company" because she is a woman.

(*Id.*, Ex. A, Attachment 2 at 1).  When she complained to her supervisor that another

employee turned on her laminator machine while she was working with the machine, the

17

supervisor told her, "This is not a woman's place."  (*Id.*, Ex. A, Attachment 2 at 1).  In the EEOC charge, Holden also alleged that ITW "has knowingly tolerated other employees sexually harassing [Holden]" by making "sexual references and innuendo" and touching her breasts.  (*Id.*, Ex. A, Attachment 2 at 2).

In this lawsuit, Holden has presented evidence of harassment and discrimination by Wilbert Barnes and Greg May that was not included in her EEOC charge.  Holden testified in her deposition that Wilbert Barnes was more physically aggressive toward her than he was to other male employees because she was a woman.  She testified that he was physically aggressive toward her, more so than he was towards male employees.  (Docket Entry No. 10, Ex. A, Attachment 1 at 244).  She alleged that Barnes threatened her and put his finger in her face, and called her a "motherfucker."  She also alleged that he denied her overtime opportunities and told her to bid down for another job because she was a woman.

As to May, Holden testified that when she began working for ITW, the first remark May made to her was that she "wasn't the person that they wanted to choose for the job." (Docket Entry No. 10, Ex. A, Attachment 1 at 114).  She also alleged that May told her several times that since she should give her job to a male with a family and that on one occasion, he told her that "they was trying to get Scott Hawkins to move [her] to [a position operating] the forklift because he had another guy to come in, said he was married with kids, and he needed that job more than [she] did."  (*Id.*, Ex. A, Attachment 1 at 245).  In addition,

18

Holden asserted that May refused to train her, "or if he did train [her], he trained [her] wrong" deliberately. (*Id.*, Ex. A, Attachment 1 at 114).

Holden's complaints about Barnes's and May's acts do not raise allegations of "entirely new acts of unlawful conduct," as ITW argues. (Docket Entry No. 10 at 13). Nor do her complaints advance a new theory of liability of which ITW had no notice. Rather, Holden's allegations about statements and acts by Barnes and May are similar to, and related to, the EEOC charge allegations of sexual harassment and discrimination and of retaliation. *See Fine*, 995 F.2d at 577–78 (noting that a litigant may raise claims in her federal complaint based on any kind of discrimination like or related to the complaints in her EEOC charge).

A Title VII lawsuit is limited to the scope of the EEOC investigation that can reasonably be expected to grow out of the charge of discrimination. *Young.*, 906 F.2d at 179 (citing *Sanchez*, 431 F.2d at 466). Holden's EEOC charge made it reasonable for the EEOC to investigate disparate and harassing treatment based on Holden's sex. *See Clark*, 18 F.3d at 1279–80. Such an investigation would reasonably include the alleged statements by Barnes and May and the alleged conduct by Barnes.

ITW's reliance on *Vitello* is misplaced. In *Vitello*, the plaintiff filed two separate EEOC charges. The first charge, filed in October 1994, alleged age discrimination and retaliation for assisting in another employee's EEOC charge in January 1993. In that EEOC charge, the plaintiff complained that he had received unjustifiably low performance reviews, was demoted while his younger and less qualified coworkers were promoted above him, was

19

suspended without pay for a day and a half, and was assigned new duties that required heavier lifting, despite having provided his supervisor with a doctor's note restricting the lifting that he could do. The plaintiff received a right-to-sue letter based on this charge in March 1995. The plaintiff filed a second EEOC charge in April 1995 after quitting his job in February 1995. In the second charge, he alleged age discrimination and retaliation based on the filing of the first EEOC charge. In the second EEOC charge, the plaintiff complained that he had been subjected to suspension, harassment, erosion of his responsibilities and duties, demotion, and disparate treatment. After receiving a right-to-sue letter based on the second EEOC charge, the plaintiff sued in October 1995, alleging violations of Title VII and the ADEA since 1993. The employer moved to dismiss the plaintiff's complaint on the ground that all the discriminatory incidents alleged in the complaint had occurred before the plaintiff's first EEOC charge and the plaintiff had failed to timely sue after receiving his right-to-sue letter based on that charge. The plaintiff argued that his complaint was timely filed because it alleged a pattern of discriminatory and retaliatory practices that continued until he quit in February 1995.

The *Vitello* court held that the plaintiff could not allege a continuing violation that would allow him to base his complaint on acts alleged in the first EEOC charge. The court found that the subject matter of the two EEOC charges was different. In the first, the plaintiff alleged a demotion in retaliation for assisting another employee's EEOC case; in the second, the plaintiff alleged retaliation for filing his own EEOC charge and asserted a "different and

distinct" set of complaints.  932 F. Supp. at 1098.  The demotion alleged in the first EEOC

charge was "an isolated employment decision rather than a recurring act" that "had a degree

of permanence that not only should have triggered [the plaintiff's] awareness of and duty to

assert his rights, but in fact did so, evidenced by the fact that [the plaintiff] filed the first

EEOC charge."  *Id.*  The demotion alleged in the second EEOC charge involved different

conduct for a different reason.  The court stressed that a series of separate violations may be

treated as a continuing violation only if "it would have been unreasonable to require the

plaintiff to sue separately on each one."  *Id.* (citing *Selan v. Kiley*, 969 F.2d 560, 565–66 (7th

Cir. 1992)).

Unlike the plaintiff in *Vitello*, Holden complains of recurring harassment, rather than

isolated or discrete employment actions.  Holden has alleged a pattern of harassment that

supports a hostile work environment claim and may be treated as a continuing violation.

*Morgan*, 536 U.S. at 115.  And unlike the plaintiff in *Vitello,* Holden filed a single EEOC

charge.  The facts and reasoning of *Vitello* are inapposite.

ITW's motion for summary judgment on the ground that Holden failed to exhaust her

administrative remedies is denied.

## C.    Has Holden Made a *Prima Facie* Case of Harassment?

ITW argues that Holden's "only actionable sexual harassment claim . . . is based on

her allegation against Mr. Frazier," (Docket Entry No. 22 at 13), and that Holden has failed

to establish a prima facie claim for sexual harassment because she has not shown that the

harassment she experienced from Frazier was sufficiently severe or pervasive to alter the conditions of her employment.  In response, Holden argues that she has provided sufficient evidence to create a fact issue as to whether she was "subjected to an objectively hostile or abusive working environment by the severe and pervasive sexually demeaning conduct and comments of her supervisors and other co-workers, including Cotton and Frazier," and whether the defendants knew of the sexual harassment and failed to take any corrective action.

A plaintiff alleging sexual harassment by her coworkers may establish a Title VII violation "by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  ITW's argument that Holden's "only actionable sexual harassment claim" is based on her allegations and evidence of unwanted physical touching is unpersuasive.  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *WC&M Enters, Inc.*, 496 F.3d at 399 (citing *Harris*, 510 U.S. at 21).  In determining whether a work environment was hostile, courts consider the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it interferes with an employee's work performance. *Id.*  The Fifth Circuit has found that "discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment that violates Title VII." *Harris-Childs v. Medco Health Solutions, Inc.,* 169 Fed.Appx. 913, 917 (5th Cir. 2006) (citing *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1049 n.9 (5th Cir. 1996)).

Holden's allegations in her complaint and the summary judgment evidence she submitted in response to ITW's show that her hostile work environment claim arises from the conduct of all her supervisors and coworkers.  The record includes evidence of both alleged physical harassment and verbal intimidation, threats, and insults.  She alleges that Cotton repeatedly tried to proposition her and that Frazier commented on her ability to sexually satisfy her husband and subjected to her unwanted physical touching.  Other male coworkers told her on numerous occasions that their workplace was no place for a woman, that her position was too strenuous for a woman, and that she needed to bid down for a lower level position so that a man with a family to support could take her job.  Holden stated in her deposition that when she received training, her entire team would deliberately tell her the wrong things.  She alleges that several coworkers were verbally abusive with her, but not with other male employees.  She also alleges that her team leaders repeatedly denied her the opportunity for overtime work because she was married and her job was no place for a woman.  She also alleges that one coworker turned her machine on when she was working in it and that her coworkers would change the settings on her machine when she left it so that she could not perform her job properly.  Holden alleges that the treatment was so extensive that she suffered physically, including nightmares, hair loss, and nausea and vomiting from

the stress.  She has alleged both physical and nonphysical acts of harassment that can "give rise to a viable Title VII claim."  *WC&M Enters, Inc.*, 496 F.3d at 400 (citations omitted).  ITW has not established that as a matter of law, Holden cannot show that the sexual harassment she experienced was sufficiently pervasive or severe to support a Title VII claim.

ITW's motion for summary judgment on the ground that Holden has failed to establish a hostile work environment claim based on sexual harassment is denied.

### D.     Has Holden Shown an Adverse Employment Action?

ITW argues that Holden's sex discrimination claim fails as a matter of law because she has failed to raise a fact issue as to whether she suffered an adverse employment action.  Holden presented summary judgment evidence that she was denied a promotion to the Laminator Operator Level 4 position and that she did not have the same opportunities to earn overtime pay as her male coworkers.  ITW asserts that Holden has worked "hundreds of hours of overtime," was promoted three times, and now works as a Rewinder after her bid for the position was accepted.  (Docket Entry No. 10 at 20).  ITW also argues that because Holden alleged that she was denied a promotion to the Laminator Operator Level 4 position in 2006, her promotion claim is barred because she could not have included such a claim in her 2005 EEOC charge and has failed to exhaust her administrative remedies for a promotion claim.  Similarly, because Holden supported her overtime-pay claim with 2006 W-2 forms showing that she had the lowest salary in her department, although she did not have the lowest hourly rate, ITW argues that Holden could not have included such a claim in her 2005

24

EEOC charge and has failed to exhaust her administrative remedies for an overtime pay claim.  ITW also contends that five other laminators worked less overtime than Holden did in 2006 and that as a result, Holden cannot establish that she suffered an actionable employment action.

In the present case, Holden has presented direct evidence of discrimination, in the form of repeated statements made that on their face show an animus against female workers. She has also presented indirect evidence.  Under the burden-shifting framework that applies to indirect evidence, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), recently modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004), Holden has met her initial burden of a *prima facie* showing of discrimination.  *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rachid*, 376 F.3d at 312.  A plaintiff satisfies this burden by showing that:  (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who were not members of her protected class.  *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003); *Okoye v. Univ. of Tex. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001); *Abarca*, 404 F.3d at 941.  ITW disputes that Holden can show an adverse employment action.

"Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands."  *Alvarado v. Tex. Rangers*, 492 F.3d 605, 612 (5th Cir. 2007)

(citing *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2007)).  "[It] has been clearly recognized that a failure to promote can be an adverse employment action under the *McDonnell Douglas* framework."  *McNealy v. Emerson Elec. Co.*, 121 Fed. Appx. 29, 33 (5th Cir. 2005).  The record shows disputed fact issues as to whether ITW refused to promote Holden or demoted her.  Holden testified in her deposition that although she was more skilled and knowledgeable about the laminator machine than Wilbert Barnes and Jimmy Shelley, Barnes and Shelley were promoted and she was not.  Holden testified in her deposition that she "was up for a promotion to start training for a Level 4 [Laminator Operator position]" but was never allowed to progress beyond the Laminator Operator Level 3 position, even though she had "already passed [her] criteria."  (Docket Entry No. 18, Ex. B at 201–04).  In addition, after she met with Virginia McDonough and Scott Hawkins on June 24, 2005 to discuss the problems she was experiencing on the "C" shift, McDonough, Hawkins, Serice, Luce, and Clothier decided that Holden would have to retrain for the Laminator Operator position from the entry level.  If she did not retrain back to her original level "within a certain length of time . . . they were going to cut [her] pay."  (Docket Entry No. 18, Ex. B at 204).  The Fifth Circuit has acknowledged that an employer's decision to change an employee's job position may constitute a demotion if the new position is objectively worse.  *Greene v. DaimlerChrysler Servs. of N. Am.*, 128 Fed.Appx. 353, 357 (5th Cir. 2005) (citing *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999)).  Because the record shows that Holden's meeting with McDonough and Hawkins took place before she filed her EEOC complaint on

26

July 8, 2005, her promotion claim is not barred for failure to exhaust her administrative remedies, as ITW argues.

The record also shows disputed fact issues as to whether Holden suffered an adverse employment action because she was denied opportunities for overtime that similarly situated male coworkers received. ITW's argument that Holden failed to exhaust her administrative remedies on this claim is not persuasive. Holden testified in her deposition that she was consistently denied opportunities to earn overtime during the course of her employment as a Laminator Operator, not just in 2006, resulting in reduced compensation. The Fifth Circuit has acknowledged that decisions that affect compensation constitute actionable adverse employment actions in sex discrimination cases. *Tyler v. Union Oil Co. of Calif.*, 304 F.3d 379, 397 (5th Cir. 2002). Similarly, ITW's argument that Holden received overtime and therefore cannot proceed on this claim is not persuasive. The issue is not whether Holden received any overtime, but whether she was denied opportunities for overtime work that male coworkers received. Holden has shown disputed fact issues as to whether she was discriminatorily denied overtime work and compensation.

ITW's summary judgment motion on Holden's sex discrimination claim is denied.

**E.   Is Holden's Retaliation Claim Precluded?**

ITW also argues that Holden's retaliation claim fails as a matter of law because she cannot show that she suffered a materially adverse employment action in that she "has not been terminated, demoted or suffered a loss in pay." (Docket Entry No. 10 at 22). ITW also

contends that to the extent Holden's retaliation claim is based on allegations of retaliatory acts occurring in 2006, she has failed to exhaust her administrative remedies as to these acts because she filed her EEOC charge in 2005. Holden has alleged and submitted summary judgment evidence that after she filed her EEOC charge in 2005, ITW retaliated against her by denying her training and overtime opportunities and giving her unwarranted disciplinary actions and poor evaluations. She contends that the proximity in time between her EEOC charge and these actions demonstrates a causal connection.

The elements of a *prima facie* case of retaliation are that the plaintiff engaged in protected conduct, that she subsequently suffered an adverse employment action, and that the adverse employment action was taken in response to her protected conduct. *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 330 (5th Cir. 2004) (citing *Chaney v. New Orleans Pub. Facility Mgmt, Inc.*, 179 F.3d 164, 167 (5th Cir. 1999)). In *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2414 (2006), the Supreme Court held that the antiretaliation provision of Title VII is not limited to ultimate employment actions. The provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 2414. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (quotations omitted); *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007). The standard for harm is objective. *Burlington*, 126 S.Ct. at 2414.

The harm must be material; Title VII does not protect an employee from trivial harms, "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 2413.  The significance of any given act of retaliation depends upon the particular circumstances of the individual employee.  *Id.* at 2414; *McCoy*, 492 F.3d at 560.

Holden has met the prima facie requirement of an adverse employment action and has raised disputed fact issues as to whether she experienced retaliation because she engaged in a protected activity.  Holden testified in her deposition that she complained numerous times to her supervisors and to ITW's human resources department about discriminatory treatment from her coworkers.  When she made a complaint to Scott Hawkins, "Scott would say something to Jimmy about what was going on the floor.  Jimmy would tell everybody what Scott had said . . . [a]nd Jimmy Shelley turned around and told me that if I didn't quit complaining, that they was going to ship my—ship me back to East Texas."  (Docket Entry No. 18, Ex. B at 189).  Holden alleges that her coworkers harassed her after she made complaints.  After Holden had complained of harassment and discrimination, she alleges that Pauline Serice told her, "Well, it's obvious to me that you can't do your job.  Why don't you just be woman enough to say that you can't do your job and just quit?  Make it easy for all of us.  Instead of me firing you, you just quit.  Go on and quit."  (Docket Entry No. 10, Ex. A, Attachment 1 at 143).  Holden also testified that she was denied overtime opportunities after complaining to ITW management about George Cotton and Reginald Frazier.  (Docket Entry No. 18, Ex. B at 249).  She alleges that after she met with Virginia McDonough and

Scott Hawkins several times in mid-June 2005 to complain about "the harassment of my teammates, the discriminations by my teammates," (Docket Entry No. 18, Ex. B at 150), she was "busted down for retraining" even though she "had met [her] criteria." (*Id.*, Ex. B at 153). She alleges that in retaliation for her complaints, she was not allowed to advance in her current position and her team members refused to train her properly. The record shows that fact issues exists as to whether Holden suffered a materially adverse employment action as a result of her complaints to ITW management about discriminatory treatment.

ITW argues that Holden has failed to show a causal link between her EEOC charge and the writeups that she received and alleges were unwarranted. ITW points out that Holden received her first corrective action notice on May 11, 2005, two months before she filed her EEOC charge. In her EEOC charge, Holden alleged retaliation for complaints she had made to her supervisors and ITW's human resources department of "harassment, sex discrimination and violation of safety regulations." (Docket Entry No. 10, Ex. A, Attachment 4 at 2). But Holden also received corrective actions after she filed her EEOC charge. There is a disputed fact issue exists as to whether Holden received an unwarranted writeup because of these complaints. ITW also argues that the second corrective action notice that Holden received on May 17, 2006 is too distant in time from her July 8, 2005 EEOC charge to be considered retaliatory conduct. The May 17, 2006 corrective action report is signed by Curtis Minor and concerns an accident Holden had because she entered an unsafe area. (*Id.*, Ex. A, Attachment 10 at 2). Holden testified in her deposition about

at least one other reprimand she received from Eric Richardson for setting up a machine improperly.  The record does not show when these reprimands occurred.  In addition, the record shows that Holden's EEOC charge was not resolved for at least six months after the filing date and that her coworkers knew that she had filed the charge.  (Docket Entry No. 18, Ex. B at 242).  A fact issue exists as to whether at least one writeup Holden received after filing her EEOC charge was causally connected to that charge.

ITW's argument that Holden cannot rely on 2006 acts to support her retaliation claim is also unpersuasive.  "It is the nature of retaliation claims that they arise *after the filing of the EEOC charge*.  Requiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case, a double filing that would serve no purpose except to create additional procedural technicalities."  *Eberle v. Gonzales*, 240 Fed. Appx. 622, 628 (5th Cir. 2007) (citing *Gupta v. E. Tex. State Univ.*, 654 F.2d 411 (5th Cir. 1981)).  It was not necessary for Holden to file another EEOC charge to allege in this lawsuit that ITW retaliated against her after she filed her EEOC charge in July 2005.

ITW's summary judgment motion on Holden's retaliation claim is denied.

## IV.    Conclusion and Order

ITW's motion for summary judgment is denied.  The agreed motion to dismiss Valeron as a party is granted.  The motions for sanctions will be addressed after an evidentiary hearing is held.  This case will be tried beginning in the two-week period from February 11, 2006 to February 22, 2008.

SIGNED on December 26, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge